UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x
                                               :

STATE OF NEW YORK and BASIL SEGGOS as     :
Commissioner of the New York State Department of   :
Environmental Conservation and Trustee of New York   :
State's Natural Resources,                             :    No: <u>2:22-cv-4091</u>
                                                 :

                           Plaintiffs,      :
                                                   :    **COMPLAINT**

                  -against-          :

                                                   :

NORTHROP GRUMMAN SYSTEMS CORPORATION,    :

                         Defendant.      :

------------------------------------------------------------------------x

Plaintiffs State of New York and Basil Seggos, in his official capacities as Commissioner of the New York State Department of Environmental Conservation and Trustee of New York State's Natural Resources (collectively, the "State"), by their attorney Letitia James, Attorney General of New York, as and for their complaint, allege as follows upon information and belief:

## NATURE OF THE ACTION

1.     This is an action under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601-9675 ("CERCLA"), as amended, and New York's common law of public nuisance and restitution (a) to recover costs that have been and will be incurred by the State in responding to the release and threatened release of hazardous substances into the environment at and from certain properties and facilities related to a former industrial complex located in the Hamlet of Bethpage, Town of Oyster Bay, Nassau County, New York (as more specifically defined in Paragraphs 23-29 below, the "Sites") ; and (b) to recover natural resource damages associated with such releases and threatened releases from the Sites.

2.     More specifically, this action seeks a judgment against defendant Northrop Grumman Systems Corporation ("Northrop Grumman"):

(a)     awarding reimbursement to the State of its costs incurred to date in responding to releases and threats of releases of hazardous substances at and from the Sites;

(b)     declaring that Northrop Grumman is liable to the State for the State's future costs in responding to such releases and threats of releases;

(c)     compensating the State for damages to its natural resources; and

(d)     awarding enforcement costs and interest.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction over the State's claims arising under the laws of the United States, pursuant to 28 U.S.C. §§ 1331 and 2201 and 42 U.S.C. §§ 9607 and 9613, and has supplemental jurisdiction over the common law claims arising under the laws of the State, pursuant to 28 U.S.C. § 1367.  The Court also has jurisdiction to enter a declaratory judgment under 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 9613.

4.     Venue is proper in this District pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because the threatened and actual releases of hazardous substances that give rise to this action occurred and/or are occurring within this District and the Sites are located within this District.

## THE PARTIES

5.     Plaintiff State of New York, as a body politic and sovereign entity, brings this action on behalf of itself and as *parens patriae*, trustee, guardian, and representative on behalf of all residents and citizens of the State, particularly those individuals who live in the vicinity of the Sites.  The State does so to recover costs and damages that have been incurred by the State in

responding to the release of hazardous substances at and from the Sites pursuant to State Finance Law § 97-b and to obtain other declaratory relief.

6.    Plaintiff Basil Seggos, as Commissioner of the New York State Department of Environmental Conservation ("DEC") and Trustee of the State's natural resources under state and federal law, brings this action to recover damages for injury to and loss of the State's natural resources, to recover costs that have been incurred by the State in responding to the release of hazardous substances at and from the Sites, and to obtain other declaratory relief.

7.    Northrop Grumman Systems Corporation ("Northrop Grumman") is a corporation established under the laws of Delaware, with its principal place of business at 2980 Fairview Park Drive in Falls Church, Virginia. Northrop Grumman is authorized to do business in this State with a place of business in Bethpage, New York. Northrop Grumman is the successor to, among other entities, Grumman Aircraft Engineering Corporation and Grumman Corporation.

8.    During the period from the 1930s to the present, Northrop Grumman has been the owner of some of the Sites and an operator of all of the Sites. During that ownership and operation, there were releases of hazardous substances on portions of the Sites that Northrop Grumman owned, and Northrop Grumman disposed of hazardous substances on portions of the Sites that Northrop Grumman owned and/or operated.

## STATUTORY AND REGULATORY BACKGROUND

**CERCLA**

9.    Under CERCLA, when there is a release or a threatened release of hazardous substances into the environment from a facility, certain categories of persons are liable to the State for the costs that the State incurs to respond to the release or threatened release as long as

the State's response actions are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a).

10.     "Hazardous substances" are defined in 42 U.S.C. § 9601(14) and include, but are not limited to, substances that the United States Environmental Protection Agency ("U.S. EPA") has designated as hazardous pursuant to 42 U.S.C. § 9602. The substances that U.S. EPA has designated as hazardous are listed in 40 C.F.R. § 302.4.

11.     A "release" includes spilling, escaping, leaching, or disposing "into the environment." 42 U.S.C. § 9601(22). The "environment" includes groundwater, land surface, and subsurface strata. 42 U.S.C. § 9601(8).

12.     A "facility" includes "any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It also includes buildings, structures, and equipment. *Id.*

13.     The term "respond" includes taking "removal" actions, "remedial" actions, and related enforcement activities. 42 U.S.C. § 9601(25). A "removal" action includes the "cleanup or removal of released hazardous substances from the environment" and the assessment and evaluation of a release. 42 U.S.C. § 9601(23). A "remedial" action means "those actions consistent with permanent remedy taken instead of or in addition to removal actions." 42 U.S.C. § 9601(24).

14.     The "national contingency plan" is set forth in 40 C.F.R. Part 300.

15.     CERCLA also provides that when there is a release or a threatened release of hazardous substances into the environment from a facility, certain categories of persons are liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable

costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a).

16.     The term "natural resources" includes "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by . . . any State." 42 U.S.C. § 9601(16).

17.     Natural resources damages include, without limitation, injury, destruction, or loss to such natural resources, and the reasonable costs of assessing such injury, destruction, or loss. 42 U.S.C. §§ 9601(6) & (16), 9607(a).

18.     The persons liable for response costs and natural resource damages under 42 U.S.C. § 9607(a) include (i) current owners and operators of a facility; and (ii) owners and operators of a facility at the time of disposal of hazardous substances. "Persons" includes, among others, individuals, firms and corporations. 42 U.S.C. § 9601(21).

19.     CERCLA provides that, in an action for recovery of costs, "the court shall enter a declaratory judgment on liability for response costs or damages that will be binding in any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2).

**New York Law**

20.     The State's third and fourth claims for relief are based on New York common law. These claims seek to abate any existing public nuisance and to recover funds that the State has spent and will spend abating any public nuisance and contamination at or from the Sites.

21.     A public nuisance is a condition that offends, interferes with, or causes damage to the public in the exercise of rights common to all, in a manner such as to offend public morals, interfere with use by the public of a public place, or endanger or injure the property, health,

safety, or comfort of a considerable number of persons. In particular, the release or threat of release of hazardous wastes into the environment is a public nuisance.

22.     Persons who cause or contribute to the creation or maintenance of a public nuisance are strictly, and jointly and severally, liable for its abatement. Fault is not an issue: a plaintiff seeking to abate a public nuisance is not required to demonstrate negligence or willful conduct on the part of the defendant.

## FACTUAL ALLEGATIONS

**The Sites**

23.     In 1983, DEC listed approximately 600 acres in Bethpage on the Registry of Inactive Hazardous Waste Disposal Sites in New York State (the "Registry") as the Grumman Aerospace-Bethpage Facility Site, Site No. 130003 (the "Original Site"). The Original Site is primarily located in an area bounded by Stewart Avenue to the north and east, Central Avenue to the south, Route 107 to the southwest, and New South Road to the west.

24.     In March 1993, DEC divided the Original Site into two parts. DEC designated approximately 500 acres of the Original Site on the Registry as the Northrop Grumman-Bethpage Facility Site, Site No. 130003A. DEC designated the remaining approximately 100 acres of the Original Site on the Registry as the Naval Weapons Industrial Reserve Plant Site, Site No. 130003B.

25.     In March 2000, DEC divided the Grumman Bethpage Facility Site, Site No. 130003A, into two parts. DEC designated one part, consisting of approximately 26 acres, on the Registry as the Northrop Grumman-Steel Los Plant 2 Site, Site No. 130003C. DEC continued to designate the remaining part of the site as the Northrop Grumman-Bethpage Facility Site, Site No. 130003A.

26.     For the purposes of this Complaint, the term "Grumman Site" is defined to include all land and facilities that DEC designated in March 1993 as the Grumman Bethpage Facility Site, Site No. 130003A, including the land and facilities later designated as the Northrop Grumman Steel Los Plant 2 Site, Site No. 130003C, irrespective of any subsequent changes to those sites' boundaries or designations.

27.     For the purposes of this Complaint, the term "Naval Weapons Site" is defined to include all land and facilities that DEC designated in March 1993 as the Naval Weapons Industrial Reserve Plant Site, Site No. 130003B, irrespective of any subsequent changes to that site's boundaries.

28.     Next to the Grumman Site, between Stewart Avenue and the eastern boundary of that Site, is an area of approximately 18 acres consisting of (a) Bethpage Community Park, part of which had been built on former industrial settling ponds, and (b) a road formerly used to access Plant 24 on the Grumman Site (collectively, the "Settling Ponds Area" or "Operable Unit 3 Area").

29.     For the purposes of this Complaint, the Grumman Site, the Naval Weapons Site and the Settling Ponds Area collectively constitute the "Sites."  A map showing the location of the Grumman Site and the Naval Weapons Site is attached as Exhibit A.

**Historical Activities at the Sites**

30.     Beginning in the 1930s, Northrop Grumman, through two of its  predecessors, Grumman Aircraft Engineering Corporation and Grumman Corporation, along with the United States Department of the Navy (the "Navy"), used the Sites for industrial and research purposes. Among other things, Northrop Grumman was a major manufacturer of military aircraft for the United States at the Sites during World War II and later, including through the Cold War.

31.    All manufacturing ceased at the Sites in 1996.

32.    At some or all times between the 1930s and the present, Northrop Grumman owned (a) the Grumman Site, and (b) portions of the Settling Ponds Area, including the part on which the industrial settling ponds were located.

33.    At some or all times between the 1930s and the present, Northrop Grumman operated (a) the Grumman Site, (b) portions of the Settling Ponds Area, including the industrial settling ponds themselves, and (c) together with the Navy, the Naval Weapons Site.

34.    During the period that Northrop Grumman owned part of the Sites and operated the Sites, Northrop Grumman released hazardous substances to the soil and groundwater at parts of the Sites that Northrop Grumman owned and/or operated, including at the former industrial settling ponds in the Settling Ponds Area.

35.    Among the hazardous substances released at those parts of the Sites at those times are several volatile organic compounds ("VOCs"), including but not limited to trichloroethene ("TCE"), and other non-VOC hazardous substances, including but not limited to 1,4-dioxane.

36.    TCE is a carcinogen that may cause kidney cancer, liver cancer and malignant lymphoma. Short-term exposure to high concentrations of TCE can cause dizziness, headaches, effects on hearing, seeing and balance, liver damage, possible kidney damage and death.

37.    U.S. EPA has classified 1,4-dioxane as likely to be carcinogenic to humans. Long-term exposure can harm the liver and kidneys. Short-term exposure can cause eye and nose irritation or, at very high levels, severe kidney and liver effects, and possibly death.

38.     Hazardous substances released at or from the Sites have entered the groundwater beneath the Sites because the Sites include or are near areas where precipitation enters the ground and percolates down through the soil to replenish the groundwater.

39.     The federal and New York State governments have set out standards, criteria and guidance that establish appropriate, relevant and applicable requirements for investigation and cleanup of inactive hazardous waste sites, including maximum permissible concentrations of hazardous substances in groundwater and soil ("standards").

40.     Groundwater contaminated by releases at and from the Sites has had, and continues to have, concentrations of hazardous substances released at or from the Sites, including without limitation TCE and 1,4-dioxane, at levels far exceeding applicable standards.

41.     The contaminated groundwater underneath the Sites migrates from the Sites to the south-southeast toward the Great South Bay, which connects to the Atlantic Ocean.

42.     Over time, the contaminated groundwater from the Sites has formed multiple underground plumes, each of which continues to move further south-southeast from the Sites. One plume area consists of groundwater that (a) is contaminated by hazardous substances at least some of which were released at or from the Operable Unit 3 Area and (b) has concentrations of such hazardous substances in excess of the respective standards for those hazardous substances (the "Eastern Plume").  Another plume area consists of groundwater that (a) is contaminated by hazardous substances at least some of which were released at or from the Grumman Site and/or the Naval Weapons Site, and (b) has concentrations of such hazardous substances in excess of the respective standards for those hazardous substances (the "Western Plume").

43.     The Eastern Plume and the Western Plume, together with other plumes (collectively, the "Plumes"), join and comingle in certain locations.  The Plumes are currently

approximately 4.3 miles long and 2.1 miles wide and extend downward to a depth of approximately 900 feet beneath the ground surface.

44.     Beneath the Sites is a portion of U.S. EPA-designated sole source aquifer that extends under much of Long Island and is the primary source of drinking water for 2.6 million Long Island residents.

45.     Approximately 360 public water supply wells in Nassau County withdraw drinking water from that sole source aquifer.

46.     The Plumes have contaminated that aquifer and have affected groundwater intake at 11 public water supply wells operated by the Bethpage Water District, South Farmingdale Water District, and Liberty Utilities (New York Water) Corp., including five public water supply wells operated by Bethpage Water District that are directly downgradient from the Sites and within the central portion of the Plumes.  Although all groundwater intake at these wells is subject to treatment before distribution to the public, and all water distributed to the public after treatment meets and has met all relevant drinking water standards, untreated groundwater taken from some of these wells has over time contained increasing concentrations of hazardous substances related to the Sites.

47.     The continuing expansion of the Plumes to the south-southeast threatens to contaminate groundwater intake at additional public water supply wells that are currently unaffected by the Plumes.

**Investigation and Remedial Work to Date**

48.     DEC listed the Grumman Site and the Naval Weapons Site on the Registry based on the on-site and off-site presence of hazardous substances in the soil and groundwater.

49.     To date, DEC, Northrop Grumman and the Navy have undertaken response activities to address soil and groundwater contamination from the release of hazardous substances at and from the Sites.  Those activities have included:  investigations; soil remediation; groundwater recovery, treatment and recharge; monitoring and well-head treatment for affected or potentially affected public water supplies; and response actions for soil vapor.

50.     An operable unit at a site represents a portion of an overall program to investigate, eliminate or mitigate a release of hazardous substances that for technical or administrative reasons can be addressed separately.

51.     Response activities at the Sites have been divided into multiple operable units, two of which are primarily relevant to this Complaint.  Operable Unit 2 consists of groundwater contamination originating in part from release of hazardous substances at and from the Grumman Site and the Naval Weapons Site.  Operable Unit 3 consists of soil and groundwater contamination originating from release of hazardous substances at and from the Settling Ponds Area.

*Operable Unit 2*

52.     In 1997, in Operable Unit 2, Northrop Grumman began operating a groundwater extraction and treatment system serving as an on-site containment system along the southern and southwestern boundary of the Grumman Site to prevent further migration of contaminants beyond this boundary.  Following withdrawal of contaminated groundwater from the aquifer, the groundwater is treated to remove the chemicals of concern and is returned to the aquifer.

53.     In March 2001, DEC issued a Record of Decision ("ROD") for Operable Unit 2 groundwater contamination from the Grumman Site ("Operable Unit 2 ROD").  The Operable

Unit 2 ROD selected a remedy for that contamination that includes, among other things, continued operation of the on-site containment system along the southern and southwestern boundary of the Grumman Site. Northrop Grumman continues to operate this system to date.

54.     In January 2003, the Navy issued, and in April 2003 amended, a ROD for the Operable Unit 2 groundwater contamination originating from the Naval Weapons Site ("Navy Operable Unit 2 ROD"). The Navy Operable Unit 2 ROD selected a remedy to be implemented by the Navy for that contamination which included, among other things, a system to extract contaminants in the eastern part of the Plumes near the Seaford-Oyster Bay Expressway. The Navy has continued to operate this system since 2008.

55.     In April 2015, DEC and Northrop Grumman entered into an Administrative Order on Consent for response actions to address Operable Unit 2 groundwater contamination (the "Operable Unit 2 Consent Order"). In accordance with the Operable Unit 2 ROD and the Operable Unit 2 Consent Order, Northrop Grumman has, among other things, continued to operate the on-site containment system located along the southern and southwestern boundary of the Grumman Site.

*Operable Unit 3*

56.     In 2009, in Operable Unit 3, Northrop Grumman began operating a second groundwater extraction and treatment system, also referred to as an on-site containment system, along the southern boundary of the Settling Ponds Area, that operates in the same manner as the system operating in Operable Unit 2.

57.     In March 2013, DEC issued a ROD for Operable Unit 3 soil and groundwater contamination ("Operable Unit 3 ROD"). The Operable Unit 3 ROD selected a remedy for that contamination that included, among other things, continued operation of the on-site containment

system along the southern boundary of the Settling Ponds Area. Northrop Grumman continues to operate this system to date.

59. In May 2014, DEC and Northrop Grumman entered into an Administrative Order on Consent for response actions to address Operable Unit 3 soil and groundwater contamination (the "Operable Unit 3 Consent Order").

59. In accordance with the Operable Unit 3 ROD and the Operable Unit 3 Consent Order, Northrop Grumman is in the process of installing a third groundwater extraction and treatment system to address contamination in a portion of the Plumes downgradient from the Settling Ponds Area known as the RW-21 Area (the "RW-21 System"). Northrop Grumman has installed groundwater extraction wells for this system but has not yet completed the infrastructure to begin use of the wells for treatment.

**Current Conditions**

60. As a result of response actions, contaminated soil at some areas of the Sites has been addressed, and DEC has delisted portions of the Grumman Site and the Naval Weapons Site from the Registry.

61. Nonetheless, notwithstanding response actions to date, the Plumes still exist and continue to expand, leading to increased concentration of hazardous substances in groundwater further and further downgradient from the Sites. Recent data show TCE concentrations many times greater than the TCE standard in the off-site portion of the Plumes.

62. These current conditions indicate that the response actions to date regarding the Plumes are not fully protective of human health and the environment.

63. In April 2019, DEC issued a feasibility study report examining possible additional actions to remediate the ongoing groundwater contamination along with a proposed amended

ROD, and in December 2019, DEC issued an Amended Record of Decision for Operable Units 2

and 3 ("Amended ROD"). The Amended ROD is attached as Exhibit B.

64. The Amended ROD states that it builds upon the Navy Operable Unit 2 ROD, the

Operable Unit 2 ROD and the Operable Unit 3 ROD, and selects a remedy, denominated as

"Alternative 5B,"to redress the Plumes' ongoing expansion toward currently unaffected water

districts and elevated levels of contamination.

65. The Amended ROD's selected remedy includes significant additional extraction

and treatment of contaminated groundwater. The remedy contemplates that extraction wells will

be placed along the perimeter of the Plumes to prevent the Plumes from migrating further, while

other extraction wells will be placed at points of particularly high contaminant concentrations in

the interior of the Plumes to remove significant amounts of the contaminants. The remedy also

contemplates construction of new groundwater treatment plants as well as over 23 miles of

underground piping to transport the extracted water from the wells to the treatment plants and to

transport the treated water from the plants to discharge locations.

**FIRST CLAIM FOR RELIEF**
**CERCLA—COST RECOVERY**

66. The State repeats, realleges and incorporates by reference the allegations

contained in Paragraphs 1 through 65 in this claim for relief.

67. The Sites are "facilities" as that term is defined in 42 U.S.C. § 9601(9).

68. Buildings, structures, and equipment where hazardous substances were deposited,

stored, disposed of, placed, or otherwise came to be located at the Sites are also "facilities" under

42 U.S.C. § 9601(9).

69.     There have been "releases" and threatened "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Sites into the "environment," as that term is defined in 42 U.S.C. § 9601(8).

70.     Hazardous substances released into the environment at the Sites include, but are not limited to, TCE and 1,4-dioxane.

71.     The State has incurred costs, and will continue to incur costs, to "respond," as that term is defined in 42 U.S.C. § 9601(25), to the releases and threatened releases of hazardous substances at and from the Sites and other facilities at the Sites, including costs to assess, monitor, evaluate, oversee, and conduct "removal" and/or "remedial actions," as those terms are defined in 42 U.S.C. §§ 9601(23) and 9601(24).

72.     42 U.S.C. § 9607(a) provides that (i) persons who are current owners or operators of a facility, and (ii) persons who were owners or operators at the time that hazardous substances were disposed of, shall be liable for the costs of removal and remedial actions that are "not inconsistent with the national contingency plan."

73.     The response actions that the State has taken and will in the future take to respond to the release of hazardous substances at and from the Sites are not inconsistent with the national contingency plan, 40 C.F.R. Part 300.

74.     Northrop Grumman is a "person" within the meaning of 42 U.S.C. § 9601(21).

75.     Northrop Grumman owned and still owns parts of the Sites. The United States Government contracted with Northrop Grumman to operate the Sites, and Northrop Grumman disposed of hazardous substances at the Sites within the meaning of 42 U.S.C. § 9607(a)(2) during the period that it owned and/or operated the Sites.

76.     Pursuant to 42 U.S.C. § 9607(a), Northrop Grumman is strictly, and jointly and severally, liable to the State for past response costs incurred by the State as a result of the release or threatened release of hazardous substances at and from the Sites and other facilities at the Sites.

77.     Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g), Northrop Grumman is strictly, and jointly and severally, liable for future response costs that will be incurred by the State as a result of the release or threatened release of hazardous substances at and from the Sites and other facilities at the Site.

## SECOND CLAIM FOR RELIEF
## CERCLA—NATURAL RESOURCE DAMAGES

78.     The State repeats, realleges and incorporates by reference the allegations contained in Paragraphs 1 through 77 in this claim for relief.

79.     Plaintiff Basil Seggos, as Commissioner of DEC, is the designated Trustee of New York's natural resources under CERCLA, 42 U.S.C. § 9607(f)(2)(B).

80.     The Sites are "facilities" as that term is defined in 42 U.S.C. § 9601(9).

81.     Buildings, structures, and equipment where hazardous substances were deposited, stored, disposed of, placed, or otherwise came to be located at the Sites are also "facilities" under 42 U.S.C. § 9601(9).

82.     There have been "releases" and threatened "releases" of "hazardous substances," as those terms are defined in 42 U.S.C. §§ 9601(14) and (22), at and from the Sites into the environment, as that term is defined in 42 U.S.C. § 9601(8).

83.     Hazardous substances released into the environment at the Sites include, but are not limited to, TCE and 1,4-dioxane.

84.     Those releases of hazardous substances have caused "injury to, destruction of, or loss of natural resources," including but not limited to groundwater, within the meaning of 42 U.S.C. § 9607(a).

85.     42 U.S.C. § 9607(a) provides that (i) persons who are current owners or operators of a facility, and (ii) persons who were owners or operators at the time that hazardous substances were disposed of, shall be liable for "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release."

86.     Northrop Grumman is a "person" within the meaning of 42 U.S.C. § 9601(21).

87.     Northrop Grumman owned and still owns parts of the Sites. The United States Government contracted with Northrop Grumman to operate the Sites, and Northrop Grumman disposed of hazardous substances at the Sites within the meaning of 42 U.S.C. § 9607(a)(2) during the period that it owned and/or operated the Sites.

88.     Pursuant to 42 U.S.C. §§ 9607(a) and 9613, Defendant is strictly, and jointly and severally, liable for the State's natural resource damages arising from the release of hazardous substances at and from the Sites.

### THIRD CLAIM FOR RELIEF
**PUBLIC NUISANCE**

89.     The State repeats, realleges and incorporates by reference the allegations contained in Paragraphs 1 through 88 in this claim for relief.

90.     The release of hazardous substances at and from the Sites and their presence in the environment, including in groundwater and in soil at and in the vicinity of the Sites, offends, interferes and causes damage to the public in the exercise of rights common to all in a manner such as to endanger or injure the property, health, safety or comfort of a considerable number of

persons. Those releases and that presence thus constitute a public nuisance endangering public health and safety.

91.     Northrop Grumman participated in the creation and/or maintenance of a public nuisance at and in the vicinity of the Sites.

92.     Northrop Grumman is also the owner of part of the Sites on which the public nuisance was created and is maintained.

93.     Because Northrop Grumman participated in the creation and maintenance of that public nuisance and is owner of the land upon which the nuisance has been created and maintained, Northrop Grumman had and has a duty to abate that public nuisance and to remediate the contamination. It has failed to adequately do so.

94.     As a result of this public nuisance, the State has expended and will in the future expend significant sums of money to abate this nuisance.

95.     Accordingly, Northrop Grumman is strictly, and jointly and severally, liable to the State under the common law of public nuisance for the creation and maintenance of a public nuisance at and in the vicinity of the Sites and for all past and future costs of the State to abate that public nuisance.

<u>**FOURTH CLAIM FOR RELIEF**</u>
**RESTITUTION**

96.     The State repeats, realleges and incorporates by reference the allegations contained in Paragraphs 1 through 95 in this claim for relief.

97.     By virtue of the facts stated above, Northrop Grumman had and still has a duty to abate the public nuisance that exists in and around the Sites, and to remediate the contamination.

98.     It has failed to adequately abate that public nuisance and to adequately remediate such contamination.

99.     The State has discharged and will continue to discharge Northrop Grumman's duty to abate that nuisance and to remediate that contamination.

100.    By discharging Northrop Grumman's duty to abate such nuisance and to remediate the contamination, the State has conferred a benefit upon Northrop Grumman.

101.    Northrop Grumman is being unjustly enriched by virtue of the State's conferral of a benefit upon it.

102.    Under the common law of the State, Northrop Grumman is liable to the State in restitution for the value of the benefit the State has conferred upon it.

## PRAYER FOR RELIEF

WHEREFORE, the State requests judgment in its favor and against Northrop Grumman upon each claim set forth above and respectfully requests that this Court enter judgment against Northrop Grumman as follows:

1.      Declaring Northrop Grumman to be strictly, and jointly and severally, liable to the State under CERCLA for, and awarding to the State, all costs and expenses, including interest, attorneys' fees and other costs of administration or enforcement, incurred by the State in responding to the releases and threat of releases of hazardous substances at and from the Sites and other facilities at the Sites.

2.      Declaring Northrop Grumman to be strictly, and jointly and severally, liable to the State under CERCLA for all future response costs and expenses, including any interest, attorneys' fees, and other costs of administration or enforcement, to be incurred by the State in responding to the releases and threat of releases of hazardous substances at and from the Sites.

3. Declaring Northrop Grumman to be strictly, and jointly and severally, liable to New York under CERCLA for, and awarding to the State, damages for injury to, destruction of, and loss of New York's natural resources.

4. Declaring Northrop Grumman strictly, and jointly and severally, liable for the creation of a public nuisance at and in the vicinity of the Sites, awarding to the State all past costs and expenses, including any interest, attorneys' fees, and other costs of administration or enforcement, of the State in abating that public nuisance, declaring that Northrop Grumman is strictly, and jointly and severally, liable to the State for all future response costs and expenses, including any interest, attorneys' fees, and other costs of administration or enforcement, to be incurred by the State in abating that public nuisance, and ordering Northrop Grumman to carry out and/or pay for the remediation of the Sites and groundwater contaminated as a result of Northrop Grumman's activities and ownership of the Sites..

5. Declaring Northrop Grumman liable to the State in restitution for Northrop Grumman's unjust enrichment as a result of the State's incurring costs to remediate contamination at or in the vicinity of the Sites resulting from Northrop Grumman's activities at the Sites and ownership of the Sites, and awarding the State restitution of all such costs, including any interest, attorneys' fees, and other costs of administration or enforcement.

6. Awarding enforcement costs and interest.

7. Ordering such other and further relief, in law or in equity, as the Court deems just and proper.

Dated:   New York, New York
         July 13, 2022

LETITIA JAMES
ATTORNEY GENERAL OF THE STATE OF NEW YORK

By: _____/s/ Andrew G. Frank_____
     Monica B. Wagner
       Deputy Bureau Chief
     Andrew G. Frank
       Assistant Attorney General
     New York Attorney General's Office
     28 Liberty Street
     New York, New York  10005
     Telephone:  212-416-8271
     E-mail: andrew.frank@ag.ny.gov

*Attorneys for Plaintiffs State of New York and Basil Seggos*